## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | | |
|---|---|---|
| In Re: Oswaldo Rodriguez, ) | Bankruptcy Case No: 14-41542 |
| Debtor. ) | |
| ) | |
| ) | |
| AMERICREDIT FINANCIAL SERVICES, INC. ) | Chapter 7 |
| D/B/A GM FINANCIAL ) | |
| Plaintiff, ) | |
| vs. ) | Adversary No: 15-00009 |
| OSWALDO RODRIGUEZ, ) | |
| Defendant. ) | Judge Cox |

### Notice of Debtor/Defendant's Pre-Trial Brief

VIA ELECTRONIC NOTICE:

To:   Cari Kauffman (Plaintiff's Counsel), Sorman & Frankel, Ltd., 180 N. LaSalle St., Suite 2700, Chicago, Illinois 60601


Please take notice that on December 2, 2015, the Debtor, by and through his attorneys, David M. Siegel & Associates, filed the attached **Debtor/Defendant's Pre-Trial Brief**.


Respectfully submitted,

/s/ Dustin B. Allen
Dustin B. Allen, IARDC#6312451
Attorney for Debtor/Defendant

David M. Siegel & Associates
790 Chaddick Drive
Wheeling, IL 60090

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

| | |
|---|---|
| In Re: Oswaldo Rodriguez ) | Bankruptcy Case No: 14-41542 |
| ) | |
| _____ ) | |
| ) | |
| AMERICREDIT FINANCIAL SERVICES, INC. ) | Chapter 7 |
| D/B/A GM FINANCIAL ) | |
|       Plaintiff, ) | |
|    vs. ) | Adversary No: 15-00009 |
| OSWALDO RODRIGUEZ, ) | |
|       Defendant. ) | Judge Cox |

**Debtor/Defendant's Pre-Trial Brief**

**I. RELEVANT FACTS TO BE SHOWN AT TRIAL**

Oswaldo Rodriguez, the Debtor, purchased a 2015 Chevrolet Equinox on October 21, 2014, from Grossinger City Autoplex, in Chicago, Illinois, with a principal loan amount of $31,141.14.

At the time of the purchase, Mr. Rodriguez, the debtor, was self-employed, selling insurance independently and through his company, Game Plan Strategy. At the time of the purchase on October 21, 2014, Mr. Rodriguez had just started earning income by driving with Uber. In the 4 days before the purchase of the vehicle (October 17 – October 20), Mr. Rodriguez had earned $528.33 in fares and rates, with a take-home earning of $425.68 after Uber's fees.

Mr. Rodriguez learned that Uber had a relationship with Grossinger City Autoplex to provide vehicles to be used through Uber. On October 21, 2014, Mr. Rodriguez entered Grossinger City Autoplex to view the deals offered. Mr. Rodriguez's former car, a 2008 Lexus ES350, was not perfectly suitable for an Uber job, and he hoped that a vehicle with more room for passengers and luggage would help him earn higher fares.

At Grossinger City Autoplex, Mr. Rodriguez spoke with salesman Jim Monti. However, he found the terms of the deal unaffordable. Mr. Monti then insisted that Mr. Rodriguez could get better loan terms if he bought the car outside of the Uber program.

Mr. Rodriguez informed Mr. Monti that he had spoken with a bankruptcy attorney and was considering whether to file a Chapter 7 bankruptcy, and that he would be using the automobile to try to bring in extra income through Uber. Mr. Monti insisted that he had sold cars to other Uber drivers, who were making large sums of money, and that if Mr. Rodriguez wanted to keep the car, he could sign a reaffirmation agreement. Mr. Rodriguez will testify that he decided to purchase the vehicle in part because of Mr. Monti's statements that other Uber drivers were making large sums of money.

Mr. Rodriguez will testify that he does not have a clear memory of the signing of the credit application, which is a key document in this case. He recalls that he was nonchalantly handed a document to sign to run his credit at the beginning of the consultation, which he signed without inquiry, but he believes this came before they spoke about his finances and only related to a credit report. He will testify that he learned that the credit application specified that the vehicle would not be used for taxi services, and about the amounts listed for his rental expense and length of employment, after the commencement of this case. He will testify that he did not recognize the credit application upon viewing it when it was presented as part of this case, and he does not have a copy in his records, but he does acknowledge that it is his signature on it. He believes that the income value came from a conversation he had with Mr. Monti in which he spoke about how much he was typically earning from his insurance job, the amount he had earned so far with Uber, and the amount he was expecting to make in the future.

Mr. Rodriguez does concede that there are some inaccuracies on the credit application, like his monthly rental expense, but he denies that these are numbers that he relayed to the salesperson.

As part of this deal, Mr. Rodriguez traded in his 2008 Lexus ES350, his only other form of transportation. This vehicle was fully paid off, with only 108,750 miles on the odometer.

Mr. Rodriguez later realized that he was not making as much money with Uber as he had expected, and it required an enormous time commitment to achieve satisfactory income, which affected his other job and family life. As a result, he realized that the automobile was not affordable. Further, upon reviewing the retail installment contract, he felt cheated with the terms of the deal, and believed that the automobile dealership had added back in amounts to the total amount financed that he had negotiated down.

Mr. Rodriguez also returned to Grossinger City Autoplex in an attempt to cancel the extended warranty. However, he was told that the special financing terms that were part of the first arrangement had expired. If he were to cancel the extended warranty, his interest rate would increase so much that his monthly payment would actually increase.

Mr. Rodriguez later initiated the bankruptcy action.

## II.  LEGAL ISSUES

The primary legal issues are whether the conduct of Mr. Rodriguez leads to the non-dischargeability of the debt incurred by him on October 21, 2014, for the purchase of a 2015 Chevrolet Equinox, financed by AmeriCredit, under 11 U.S.C. §523(a)(2)(A), §523(a)(2)(B), or §523(a)(2)(C).

## III.  APPLICABLE LAW

AmeriCredit brings this suit under 11 U.S.C. §523(a)(2)(A), §523(a)(2)(B), and §523(a)(2)(C). The first, §523(a)(2)(A) aims to except from discharge debt obtained through fraud, but excludes fraud obtained though "a statement respecting the debtor's or an insider's financial condition." This section is modified by §523(a)(2)(C), which modifies §523(a)(2)(A) exclusively, shifting the burden of proof to the debtor and creating a rebutable presumption toward non-dischargeability in certain circumstances. Finally, §523(a)(2)(B) allows for a finding of fraud for certain written statements respecting a debtor's financial condition. As the bulk of AmeriCredit's claim for non-dischargeability arises from written statements regarding financial condition, to succeed in their claim, AmeriCredit must meet all of the elements of §523(a)(2)(B).

### A.  11 U.S.C. §523(a)(2)(B) – A Statement in Writing

Under 11 U.S.C. §523(a)(2)(B), a creditor must prove that a debtor used "a statement in writing—(i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive…." All elements must be proven by the party objecting from the discharge of debt by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279 (1991).

### 1.  "Intent to Deceive"

One critical inquiry is whether the creditor can show that the statements made by the debtor were made with an "intent to deceive." 11 U.S.C. §523(a)(2)(B). This "intent to deceive" has been defined as a "showing of fraudulent intent or moral turpitude on the part of the debtor." Carini v. Matera, 592 F. 2d 378, 380 (7th Cir. 1979). While courts have held that a reckless disregard can provide evidence of the debtor's intent, reckless disregard is not the standard needed to be proven. See Matter of Sheridan, 57 F. 3d 627 (7th Cir. 1995) ("Kimzey stated that an intent

to deceive may be inferred from certain evidence and did not hold that a court *must* infer intent [….] Whether to infer the requisite intent is left to the bankruptcy court that presides over the case.)(emphasis added).

It is the burden of AmeriCredit to establish that Mr. Rodriguez formed the requisite intent to deceive them. The circumstances of the formation of the credit application leads to the conclusion that Mr. Rodriguez did not form the requisite intent to deceive the creditor. Clearly, as the document was typed at the dealership, Mr. Rodriguez himself did not insert the financial information onto the credit application. Mr. Rodriguez's testimony about the manner in which the only credit form that he recalls was presented to him also indicates that he did not realize the extent in which the document focused on his financial circumstances. Finally, the fact that Mr. Rodriguez walked into Grossinger City Autoplex to potentially get a vehicle for use specifically through Uber and walked out with a car not to be used as a taxi can also lead to the inference that the credit application was not presented to him in a manner by the dealership that allowed him to be fully cognizant of what he was signing, leading to the conclusion that he could not have formed the requisite intent. See, e.g., In re Bailey, 147 BR 157 (Bankr. N.D. Ill. 1992) (holding that a creditor did not establish fraudulent intent when, among other factors, a third-party filed out a credit application that the debtor later signed).

Attention should be paid to the role of the salesperson in this transaction. While not a party before the court, the salesperson has the obvious incentive to present information to the finance company that would lead to a sale, especially after Mr. Rodriguez rejected the automobile deal through Uber.

AmeriCredit may point to certain facts to attempt to create the inference of moral turpitude Mr. Rodirguez, and that he did not intend to pay for the loan at the time of inception.

He did not make a payment on the vehicle and certain elements of the credit application are untrue, like the rent payment and length of employment. Further, the contract does state that the vehicle financed through the loan would not be used for taxi services, which was the primary purpose of the loan. However, the overwhelming majority of the evidence points to the fact that Mr. Rodriguez intended to pay for the vehicle at the time of the contract's inception. Mr. Rodriguez traded in his only other means of transportation as part of the deal. While Mr. Rodriguez did contemplate bankruptcy prior to the purchase of the vehicle, he discussed reaffirmation agreements with the salesperson. Mr. Rodriguez made repeated phone calls to Grossinger City Autoplex and its employees in the days subsequent to the purchase, evidencing that subsequent events changed his state of mind. Indeed, he returned to Grossinger City Autoplex with the intent of canceling his extended warranty to try to lower his monthly payment, evidencing that he was trying to make the automobile loan work if possible, and that his intent to surrender the car arose after the inception of the deal.

### 2. "Materially False"

Among the elements of 11 U.S.C. §523(a)(2)(B), the creditor must prove that the statement in writing is "materially false." While not necessarily determinative, courts have looked to "a recurring guidepost" to determine materiality - "whether the lender would have made the loan had he known of the debtor's true financial condition." Matter of Bogstad, 779 F. 2d 370 (7th Cir. 1985); Matter of Harasymiw, 895 F. 2d 1170 (7th Cir. 1990) (declining to call this approach essential to the "materially false" element, but again noting that it is a "recurring guidepost"); In re Bryson, 187 B.R. 939, 962 (Bankr. N.D. Ill 1995) (calling this approach the "but for" approach). Some lower courts apply a "substantial untruth" test, holding that material falsity can be established if a statement "paints a substantially untruthful picture of a financial

condition by misrepresenting information of the type which would normally affect the decision to grant credit." Id.

Scrutinizing whether a statement is materially false is an important consideration. Given the nature of bankruptcy, it is important that creditors are not able to escape a discharge of their claims simply because they are able to go back and identify non-material elements leading to the formation of the debt; they must show that they only accepted the deal because of this specific representation, which is why the "but for" approach is the better approach. Even if the "substantial untruth" test is applied, the creditor must show that Mr. Rodriguez's credit application is substantially untrue.

In this case, the credit application did not provide any guidance of how to calculate income for the purposes of the application. Mr. Rodriguez simply relayed the information about his self-employment and new employment to the automobile dealership, which generated the application on his behalf. At the time of the formation of the credit application, Mr. Rodriguez's insurance income and Uber income (although with a small sample size) together were, for a short time, substantially higher than when he filed for bankruptcy later. The creditor would have to demonstrate at trial that Mr. Rodriguez's actual income at the time of entering into the loan was materially false.

While there are other minor inconsistencies, like the incorrect information about his rental expense and length of employment, the creditor still holds the burden of proving that this inconsistency is material to the formation of the contract. The length of employment is a factor that could lead a lender to think that an applicant's employment is more stable, but the creditor must show at least that this is a factor that they even consider when forming a contract; under the "but-for test," they must also show that the loan would not have been financed had the creditor

known of the debtor's financial circumstances. Similarly, a change in rental expense may lead a lender to think that an applicant had more disposable monthly income, but the debtor may well have qualified for the loan if the finance company knew the correct amount.

**B.  11 U.S.C. §523(a)(2)(A) – Fraud Other Than Statements Regarding Financial Condition**

Debt incurred by fraud can be excepted from discharge under 11 U.S.C. § 523(a)(2)(A). For a debt to be considered non-dischargeable under this section, three elements must be proven: one, that the debtor obtained money "through representations which the which the debtor either knew to be false or made with such reckless disregard for the truth as to constitute willful misrepresentation;" two, that the debtor "possessed scienter, i.e., an intent to deceive;" third, the creditor "must show that it actually relied on the false representation, and that its reliance was reasonable." In re Kimzey, 761 F.2d 421, 423 (7th Cir. 1985). Each element must be proven by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279 (1991). Further, this section of the Bankruptcy Code cannot be used to create a non-dischargeable debt resulting from "a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. §523(a)(2)(A).

**1.  "Statement Respecting Financial Condition"**

As a threshold matter, the court should hold that 11 U.S.C. §523(a)(2)(A) should not apply to any financial statements. This section simply does not apply to statements "respecting the debtor's or an insider's financial condition." 11 U.S.C. §523(a)(2)(A). There are two views about what this phrase means. Under the narrow view, a statement is only about a debtor's financial condition if it depicts the debtor's entire financial picture. See In Re Buralli (Bankr. N.D. Illinois 2015) (memorandum decision in Adversary Proceeding case no. 10-A-96183). The broad view includes these statements and includes any other statement that relays information about the debtor's finances. Id. Either view applies to the credit application submitted by Mr. Rodriguez

and other similar documents, which means that this section of the Bankruptcy Code cannot be used to render a debt non-dischargeable for these statements.

**2. "Scienter"**

One essential element in determining a debt non-dischargeable under §523(a)(2)(A) is the debtor's scienter (actual intent to deceive). "'Constructive' fraud" alone will not suffice; only "'actual' or 'positive' fraud" is actionable. In re Mercer, 246 F. 3d 391 (5th Cir. 2001) (citing Ames v. Moir, 138 U.S. 306, 311 (1891) ("fraud in the act ... defining [non-dischargeability] ... means positive fraud, or fraud in fact, involving moral turpitude or intentional wrong, ... and not implied fraud, or fraud in law, which may exist without the imputation of bad faith or immorality" (internal quotation marks omitted)).

Courts, noting how difficult it is to prove a Debtor's subjective intent, have examined the conduct required to satisfy the scienter element of fraud for the purposes of exception from discharge, mainly looking at the totality of the circumstances. In re Paul, 266 BR 686 (Bankr. N.D. Ill. 2001). Several recurring factors include "(1) The length of time between the charges made and the filing of bankruptcy; (2) Whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made; (3) The number of charges made; (4) The amount of the charges; (5) The financial condition of the debtor at the time the charges were made; (6) Whether the charges were above the credit limit of the account; (7) Whether the debtor made multiple charges on the same day; (8) Whether or not the debtor was employed; (9) The debtor's prospects for employment; (10) Financial sophistication of the debtor; (11) Whether there was a sudden change in the debtor's buying habits; and (12) Whether the purchases were made for luxuries or necessities." In re Green, 296 BR 173 (Bankr. C.D. Ill. 2003) (citing In re Dougherty, 84 B.R. 653, 657 (9th Cir. BAP 1988)).  While these factors are often instructive on

determining the state of mind of a debtor, the critical issue is the subjective intent. In re Alvi, 191 BR 724 (Bankr. N.D. Ill. 1996).  This subjective intent is measured at the time of the incursion of debt; while later developments may allow for intent to be inferred, "ensuing conduct contrary to a former representation by a debtor does not establish that the original representation was false." In re Scarpello, 272 BR 691 (Bankr. N.D. Ill. 2002).

The court should look to the same factors considered for the "intent to deceive" element under 11 U.S.C. §523(a)(2)(B) for determining Mr. Rodriguez's subjective intent.  It is worth noting that while some of the above factors weight against Mr. Rodriguez, such as the time between the purchase and the bankruptcy, and whether a bankruptcy attorney was consulted prior to the purchase, other factors act to rebut any inference that Mr. Rodriguez did not intend to pay for the vehicle at the time of the purchase.  Mr. Rodriguez traded in his only other source of transportation and spoke with the salesman about reaffirmation agreements.  Further, Mr. Rodriguez's conduct after the purchase shows that the intent to surrender the vehicle and not pay for the debt arose after the inception of the deal.

### C.  11 USC §523(a)(2)(C) – Shifting the Burden Under 11 U.S.C. §523(a)(2)(A)

Under 11 U.S.C. §523(a)(2)(C), a presumption applies towards non-dischargeability for "consumer debts owed to a single creditor and aggregating more than $500 for luxury goods or services incurred by an individual debtor on or within 90 days before the order for relief…."  This presumption only applies to claims under 11 U.S.C. §523(a)(2)(A).

### 1. "Consumer Debt"

"Consumer debt" is defined by 11 U.S.C. §101 as "debt incurred by an individual primarily for a personal, family, or household purpose."  Non-consumer debt is typically "debt incurred for a business venture or with a profit motive." In re Runski, 102 F.3d 744, 747 (4th Cir.1996); See

also In re Booth, 858 F.2d 1051, 1055 (5th Cir.1988) ("The test for determining whether a debt should be classified as a business debt, rather than a debt acquired for personal, family or household purposes, is whether it was incurred with an eye toward profit").  In cases in which there have been multiple incursions of debt have been made, "'primarily' has generally been construed as meaning at the very least a majority." In re Pedigo, 296 B.R. 485, 490 (Bankr.S.D.Ind. 2003) (citing In re Stewart, 175 F.3d 796 (10th Cir.1999); In re Kelly, 841 F.2d 908 (9th Cir.1988)).

Simply, because Mr. Rodriguez purchased the vehicle with the intent that the primary purpose of the vehicle was to be used to drive with Uber, the court should hold that it is not a "consumer debt" within the meaning of 11 U.S.C. §101 and §523(a)(2)(C).

**2.  "Luxury Goods or Services"**

Even if the Court finds that the purchase is a "consumer debt" under 11 U.S.C. §523(a)(2)(C), the section would still not apply because the incursion of debt is not for "luxury goods or services.  Under this section, "luxury goods or services" does not include "goods or services reasonably necessary for the support or maintenance of the debtor or a dependent of the debtor…."  The statute does not describe what "luxury goods or services" *does* include. See e.g., In re Faulk, 69 BR 743 (Bankr. N.D. Ind. 1986) ("The Code does not define the phrase "luxury goods or services," except to exclude from the definition….")

Courts have grappled with the definition of "luxury goods or services" in the absence of statutory language, mainly looking at the totality of the particular circumstances of the debt.  See e.g., In re Davis, 56 B.R. 120 (Bankr. D. Mont. 1985).  Courts have looked at many factors, including "whether it replaced an existing item that had outlived its usefulness or was a new acquisition, whether it was used in the ordinary activities of daily living,…and so forth."  Id.

Debtor's purchase of the vehicle does not classify as a "luxury." The court should look to the totality of the circumstances when making this decision. While indeed a new car, the purpose of the purchase was to facilitate Debtor's employment with Uber and not simply personal pleasure. Indeed, Debtor specifically wanted a larger vehicle to more easily transport larger number of passengers and larger amounts of cargo. In addition, Debtor traded in a paid-off Lexus, an arguably luxury car, to help facilitate the purchase.

**D. Overall Considerations**

In light of all of these considerations, it is important to also recognize that the overall purpose of the Bankruptcy Code is to allow debtors a "fresh start." Grogan v. Garner, 498 US 279, 286 (1991). Its role is to give the "honest but unfortunate debtor…a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt." Local Loan Co. v. Hunt, 292 US 234 (1934). As a result, the provisions of the Code should be construed favorably towards the debtor unless a clear and proven reason to the contrary.

        Respectfully submitted,

        /s/ Dustin B. Allen
        Dustin B. Allen, IARDC#6312451
        Attorney for Debtor/Defendant

David M. Siegel & Associates
790 Chaddick Drive
Wheeling, IL 60090